

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>HAWAII ISLAND AIR, INC.,<br><br>Debtor. | Case No. 17-01078<br>Chapter 7 |
| ELIZABETH A. KANE, TRUSTEE,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD OSHIRO,<br><br>Defendant. | Adv. Pro. No. 19-90048<br><br>Dkt. 1 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial in this adversary proceeding was held on December 1, 2020.

1

Simon Klevansky, Esq., and Elaine Chow, Esq., appeared on behalf of plaintiff Elizabeth A. Kane, chapter 7 trustee of Hawaii Island Air, Inc. ("Island Air"). Donald L. Spafford, Jr., Esq., appeared on behalf of defendant Richard Oshiro.

Based on the evidence, I make the following

## FINDINGS OF FACT

Pursuant to an Employment Agreement dated June 1, 2016, Island Air hired Mr. Oshiro as an employee to serve as Island Air's Vice President of Sales and Marketing. Island Air hired Mr. Oshiro based in part on his thirty-year professional relationship with Island Air's president, David Uchiyama.

Island Air agreed to provide Mr. Oshiro "such employee benefits as are generally available to senior executive employees of [Island Air], including without limitation reimbursement of reasonable expenses incurred in performing his duties under this Agreement," such as meals and travel expenses. The Employment Agreement also provided that, if Island Air terminated Mr. Oshiro's employment without cause after employing Mr. Oshiro for at least twelve months, Mr. Oshiro would be entitled to a

2

severance payment equal to two months of his base salary.

The Employment Agreement was a form that Island Air generally used at the time for its senior executive employees. Island Air incurred its obligations under the Employment Agreement in the ordinary course of business of Island Air and Mr. Oshiro.

Mr. Oshiro's employment began on June 16, 2016.

During the term of his employment, Mr. Oshiro submitted requests for expense reimbursement more-or-less monthly. Initially, Island Air reimbursed expenses within a month after Mr. Oshiro submitted a request, but later made the reimbursements irregularly and more slowly, sometimes three or four months after Mr. Oshiro submitted a request. This happened because, by early 2017, Island Air was facing increasingly desperate financial problems and suffering from severe cash shortages. Eventually, Island Air paid only those expenses that it had to pay to continue operating. By June 2017, Island Air had to engage in extraordinary transactions (such as a loan from a related party that was documented as a "sale" of spare parts) to generate enough cash to make payroll.

3

Island Air terminated Mr. Oshiro's employment without cause (and without any advance notice to Mr. Oshiro) on September 18, 2017. As a result, Mr. Oshiro became entitled to severance pay under the Employment Agreement.

But Island Air did not simply pay the severance. Instead, it required Mr. Oshiro to sign a Termination Agreement, under which Island Air paid Mr. Oshiro $25,000, the same amount as the severance payment under the Employment Agreement, but "in consideration for Oshiro executing [the Termination] Agreement, which contains a general release of claims, as well as Oshiro's agreement to be bound by and to comply with all of the terms and conditions of" the Termination Agreement. One of those terms required Mr. Oshiro to provide information and cooperation for a ninety-day period after termination. The Employment Agreement did not require Mr. Oshiro to provide a general release before receiving his severance and did not require him to provide any services after he was fired.

Also on September 18, 2017, Mr. Oshiro submitted his request for reimbursement of expenses incurred in August and September 2017. Island

4

Air paid the amount requested the very next day. During the ninety-day period ending on October 16, 2017 (the "preference period"), Island Air paid expense reimbursements to Mr. Oshiro in the total amount of $7,399.24.

Mr. Oshiro signed the Termination Agreement on September 26, 2017, and Island Air signed it on October 4, 2017, after the expiration of a seven-day rescission period provided by the Termination Agreement. (The Employment Agreement did not provide for a rescission period.) On the same day (during the preference period), Island Air tendered a check to Mr. Oshiro in the amount of $13,596.81, which represented $25,000 less (a) state and federal income tax withholdings of $6,459.34 and $1,729.31, respectively; (b) a 401k retirement plan contribution of $2,509.53; and (c) other deductions and withholdings, the nature of which was not explained at trial and cannot be ascertained from Mr. Oshiro's paystub (trial exhibit TR21).

Island Air terminated other senior executive employees during 2017. There is no evidence that Island Air required any of those employees other than Mr. Oshiro (with one possible exception) to sign an agreement like the

5

Termination Agreement or that it paid severance or final expense reimbursements to any such employee. Island Air treated Mr. Oshiro better than similarly situated employees because Mr. Uchiyama, who was Island Air's CEO, had a decades-long professional relationship with Mr. Oshiro and personally felt guilty about terminating Mr. Oshiro's employment.

Island Air commenced a chapter 11 bankruptcy case on October 16, 2017.

Each of Island Air's payments to Mr. Oshiro was a "transfer of an interest of [Island Air] in property" within the meaning of 11 U.S.C. § 547(b).

The expense reimbursements and at least $24,320.99 of the $25,000 payment were paid to or for the benefit of Mr. Oshiro.[1] Mr. Oshiro was a creditor of Island Air because Island Air owed him money under the Employment Agreement. Thus, these payments were made "to or for the benefit of a creditor" within the meaning of 11 U.S.C. § 547(b)(1).

These payments were made on account of an "antecedent debt"

---

[1] Mr. Oshiro argues that, at most, he should be liable only for the $13,596.81 portion of the $25,000 payment that he actually received in cash. But the amounts withheld for state and federal income tax also benefitted him on a dollar-for-dollar basis because he could use that money to pay his income taxes. The 401k retirement plan deduction also benefitted him because the money was presumably deposited in his retirement account.

6

withing the meaning of 11 U.S.C. § 547(b)(2): Island Air's preexisting obligations to Mr. Oshiro under the Employment Agreement.

There is no evidence to rebut the statutory presumption, under 11 U.S.C. § 547(b)(3) and (f), that Island Air was insolvent when it made these payments.

The payments were made during the preference period under 11 U.S.C. § 547(b)(4).

The payments enabled Mr. Oshiro to receive more than he would have received if Island Air had filed a chapter 7 proceeding, Island Air had not made the payments to Mr. Oshiro, and Mr. Oshiro had received distributions pursuant to law in Island Air's chapter 7 case, all within the meaning of 11 U.S.C. § 547(b)(5).

Based on these findings of fact, I draw the following

## CONCLUSIONS OF LAW

The bankruptcy court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. The parties agree that this is a core proceeding under 28 U.S.C. § 157(b)(2)(F); therefore, the bankruptcy court has power to

7

enter a final judgment.

There is no dispute that the trustee has proven the elements of a preferential transfer case under 11 U.S.C. § 547(b). Indeed, this is an archetypal preference case: a hopelessly insolvent debtor fully paid its debt to a high-ranking officer (at least partly because of his relationship with the debtor's CEO), on the brink of the debtor's bankruptcy filing, and while the debtor was not paying other creditors (including lower-ranking employees). Section 547 was designed (in part) to defeat such unequal treatment.

The only disputed question is whether Mr. Oshiro is entitled to the benefit of the "ordinary course" defense, which provides that

> The trustee may not avoid under this section a transfer . . . to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> (B) made according to ordinary business terms . . . .

11 U.S.C. § 547(c)(2).

Mr. Oshiro bears the burden of proving these elements. 11 U.S.C. § 547(g); *Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1298

8

(11th Cir. 2009).

First, he must show that he and Island Air incurred the debts paid to him during the preference period in the ordinary course of their respective businesses or financial affairs. Mr. Oshiro carried his burden of proving this element. The evidence showed that Island Air made similar employment agreements with its senior executives who were hired around the same time as Mr. Oshiro.

Second, Mr. Oshiro must show that the payments by Island Air were made either (a) in the ordinary course of their respective businesses or financial affairs or (b) according to ordinary business terms. These are sometimes referred to as the "subjective" and "objective" ordinary course of business defenses, respectively. *See, e.g., Wedgwood USA, Inc. v. UPS, Inc. (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 827 (Bankr. S.D.N.Y. 2014); *Ciesla v. Harney Management Partners (In re KLN Steel Prods. Co.)*, 506 B.R. 461, 479 (Bankr. W.D. Tex. 2014).

Mr. Oshiro did not attempt to use the objective ordinary course defense. Instead, he relies entirely on the subjective test.

9

The subjective ordinary course defense requires the court to "focus . . . on 'the specific relationship between the parties and the particular course of dealing between the parties.'" *NSC Creditor Trust v. BSI Alloys, Inc. (In re Nat'l Steel Corp.)*, 351 B.R. 906, 913 (N.D. Ill. 2006) (quoting *Barber v. Golden Seed Co.*, 129 F.3d 382, 390 (7th Cir. 1997)). The parties' contract is relevant, but not determinative. *Id.* The debtor's history of payments to other creditors is irrelevant. *See Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 244 (Bankr. D. Del. 2010) ("[T]he subjective test reviews the transactions between the debtor and the defendant, not a debtor's transactions with all of its creditors."), *aff'd,* 511 B.R. 726, 729 (D. Del. 2013).

> The subjective ordinary-course defense asks whether the payments the debtor made to the creditor *during* the preference period are consistent with the parties' practice *before* the preference period. The inquiry is not governed by any precise legal test, but generally entails using the debtor's payment history to calculate a baseline for the companies' dealings and then comparing preference-period payments to that baseline. While substantial deviations from established practices are not protected, the ordinary-course defense allow[s] suppliers and other furnishers of credit to receive payment within the course that has developed in the commercial relationship between the parties.
>
> *Unsecured Creditors Comm. v. Jason's Foods, Inc. (In re Sparrer Sausage*

10

*Co.)*, 826 F.3d 388, 393 (7th Cir. 2016) (citations and quotation marks omitted).

To decide whether a transaction satisfies the subjective ordinary course defense, courts have considered the following factors, among others:

> (1) the length of time the parties were engaged in the transaction at issue;
> (2) whether the amount or form of tender differed from past practices;
> (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and
> (4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*In re Nat'l Steel Corp.*, 351 B.R. at 912–13. "Delay is particularly relevant in taking a payment outside the ordinary course of business exception." *Mordy v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.)*, 971 F.2d 396, 398 (9th Cir. 1992).

The trustee emphasizes, and Mr. Oshiro does not deny, that during the latter part of Mr. Oshiro's employment and when he received the challenged payments, Island Air was failing to pay millions of dollars of other debts. But because the subjective ordinary course defense considers only the transactions between the debtor and the preferred creditor, the debtor's

11

failure to pay its other creditors is not relevant.

However, even focusing exclusively on the relationship between Island Air and Mr. Oshiro, there was nothing ordinary about the payments to Mr. Oshiro during the preference period.

First, there was a significant shift in the timing of the expense reimbursements. At the beginning of Mr. Oshiro's employment, Island Air paid the reimbursements about a month after each request. Island Air began to pay the reimbursements later as its financial crisis deepened in 2017, until the last reimbursement, which it paid on the same day that Mr. Oshiro made the request.

Second, the payment of "severance" was also extraordinary. Island Air could have simply made the severance payment as the Employment Agreement required. Instead, Island Air paid Mr. Oshiro in consideration for Mr. Oshiro's execution of the Termination Agreement. That agreement deviated from the terms of the Employment Agreement in multiple important respects—it included a general release, a post-termination cooperation obligation, and a seven-day rescission period, none of which

12

were in the Employment Agreement. These brand-new terms took the payment out of the ordinary course of business.

Therefore, I conclude that Mr. Oshiro has failed to carry his burden on the ordinary course defense.

## **CONCLUSION**

The trustee is entitled to judgment against Mr. Oshiro in the amount of $31,720.23. Counsel for the trustee shall submit a proposed form of judgment.

**END OF ORDER**